**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

_____
)
WELLS FARGO ADVISORS, LLC,                       )
                                                 )
                        Plaintiff,               )
                                                 )
              vs.                                 )       CASE NO. 15 -4648
                                                 )
                                                 )
KNOW YOUR OPTIONS, LLC, *d/b/a*                  )
RCM WEALTH ADVISORS,                             )       JURY TRIAL DEMANDED
TIMOTHY M. WEBB, MICHAEL A.                      )
CAVANAUGH, MARC J. GRENS, and                    )
WILLIAM C. GRIFFIS,                              )
                                                 )
                        Defendants.              )
_____ )

## COMPLAINT AND PETITION TO CONFIRM ARBITRATION AWARD

Plaintiff, WELLS FARGO ADVISORS, LLC ("Wells Fargo" or the "Company"), by and through its attorneys, Christopher S. Griesmeyer and Mack H. Reed of Greiman, Rome & Griesmeyer, LLC, and for its Complaint against Defendants KNOW YOUR OPTIONS, LLC, *d/b/a* RCM WEALTH ADVISORS ("RCM"), TIMOTHY M. WEBB ("Webb"), MICHAEL A. CAVANAUGH ("Cavanaugh"), MARC J. GRENS ("Grens") (collectively, the "RCM Defendants") and WILLIAM C. GRIFFIS ("Griffis") (together with the RCM Defendants, the "Defendants"), and for its Petition to Confirm Arbitration Award against Griffis, states:

### NATURE OF COMPLAINT

1.      This raiding-and-recruiting lawsuit arises from the Defendants' concerted and systematic efforts to damage Wells Fargo's business by utilizing a "Trojan horse" – specifically, Defendant Griffis – to unfairly compete with the Company by funneling business opportunities away from Wells Fargo to RCM (one of its direct competitors) when Mr. Griffis was still actively employed with Wells Fargo and owed fiduciary duties to the Company.

2.      For nearly *eight (8) months*, the RCM Defendants knowingly conspired with and aided Mr. Griffis' breach of his fiduciary duties to his employer, Wells Fargo.  Defendant Griffis' breaches of fiduciary duties included, but were not limited to, engaging in the prohibited practice of "selling away" by diverting business away from Wells Fargo (his then-current employer) to RCM, and actively assisting the RCM Defendants with their competitive business operations while he was still employed by Wells Fargo.

3.      The RCM Defendants also brazenly interfered with Wells Fargo's contractual rights and ongoing business expectancies by inducing Mr. Griffis to resign and breach his contractual obligations to the Company.

4.      Immediately after his resignation from Wells Fargo, the RCM Defendants further assisted Mr. Griffis in fraudulently transferring his assets for the sole purpose of hindering the Company's efforts to collect his contractual indebtedness.

5.      As stunning as the Defendants' misconduct is, it very nearly went unnoticed. Wells Fargo only recently obtained documentary evidence of the Defendants' misconduct in response to a third-party subpoena issued in an unrelated collection action that Wells Fargo had filed against Griffis before the Financial Industry Regulatory Authority's ("FINRA") Office of Dispute Resolution.  As explained more fully below, this collection action subsequently resulted in the entry of an Arbitration Award against Mr. Griffis and in favor of Wells Fargo in the amount of $289,582.90 (plus accruing interest), which Wells Fargo is seeking to confirm.

6.      In response to that FINRA subpoena, RCM initially produced only a handful of responsive documents to Wells Fargo on December 2, 2014.  When RCM (through Defendant Webb) subsequently refused to supplement its production and produce all documents requested in the subpoena, Wells Fargo filed a motion to compel and successfully obtained an Order from the FINRA Arbitrator compelling RCM to produce additional responsive documents.

7.     In response to that FINRA Order, and facing penalties for contempt, RCM finally supplemented its production by tendering several hundred pages of e-mail messages to Wells Fargo on or around February 26, 2015.  Only then did Wells Fargo begin to learn of Defendants' misconduct.

8.     In short, Wells Fargo was required to go to great lengths to obtain documents from RCM regarding its recruitment of Griffis.  Even now, it is obvious that RCM did not fully comply with the Company's subpoena – for example, RCM failed to produce most of the files and documents "attached" to the e-mails it produced.

9.     Notwithstanding the fact that RCM selectively produced documents in response to the FINRA subpoena, the content of those documents is nothing short of appalling.  By way of example only:

   a.   The limited documents RCM produced (after it was forced to do so) show that in the eight (8) months prior to his resignation from Wells Fargo, the RCM Defendants provided Mr. Griffis with account transfer paperwork that enabled him to divert business away from his employer to RCM.

   b.   The documents also show that just two (2) months later – *while he was still employed by Wells Fargo* – Mr. Griffis utilized resources the RCM Defendants had provided in order to funnel business opportunities that rightfully belonged to Wells Fargo to RCM, including, but not limited to, a $250,000 fixed annuity.

   c.   The documents further demonstrate that the RCM Defendants were not dismayed by Mr. Griffis' diversion of business opportunities away from his employer, as any right-thinking person would have been.  Rather, the RCM Defendants were *elated* by the prospect of usurping that business opportunity for themselves; they even provided Mr. Griffis with additional marketing materials for him to distribute to his clients on behalf of RCM *while he remained employed by Wells Fargo*.

d.   The documents also show the RCM Defendants actively worked with Griffis to develop business practices with the stated goal of facilitating Defendants' efforts to poach Wells Fargo's clients; once again, Mr. Griffis and the RCM Defendants engaged in this conduct *while he was still employed by Wells Fargo* and owed the Company the utmost fiduciary duty of loyalty.

10.     Once Defendants decided that Mr. Griffis inflicted enough damage to Wells Fargo "from the inside," he finally resigned from the Company on September 13, 2013, and "officially" started working for RCM at that time.

11.     After he resigned from Wells Fargo, however, Mr. Griffis refused to repay more than $180,000 that he owed to the Company under a promissory note, despite the fact that he was contractually obligated to do so.  It was this contractual debt that eventually precipitated Wells Fargo's collection action against Mr. Griffis and subsequent entry of the $289,582.90 FINRA Arbitration Award against him.

12.     As Wells Fargo discovered (when RCM tendered its supplemental document production in the FINRA proceeding on or about February 26, 2015), the refusal by Mr. Griffis to repay his contractual debt was part of a deliberate strategy concocted by the RCM Defendants and their lawyer.  More specifically, the RCM Defendants evaluated Mr. Griffis' promissory note and employment contract with Wells Fargo and advised him on how to proceed.  Before the RCM Defendants convinced him otherwise, Mr. Griffis expressly stated that he had "full intentions" of repaying his debt to Wells Fargo.  Once again, all of this occurred *while Mr. Griffis was still employed at Wells Fargo.*

13.     The Defendants' conduct is completely indefensible.  Mr. Griffis was of course free to seek employment with one of Wells Fargo's competitors, but he had no right to actively assist RCM for almost eight months at his employer's expense. And the RCM Defendants had no right to encourage and assist Griffis to breach his fiduciary and contractual duties to Wells Fargo.

4

## THE PARTIES

14.     Wells Fargo is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in St. Louis, Missouri. Wells Fargo's sole member is Wachovia Securities Financial Holdings, LLC. In turn:

    a. Wachovia Securities Financial Holdings, LLC is a limited liability company organized under the laws of the State of Delaware and has its principal place of business in St. Louis, Missouri.

    b. Wachovia Securities Financial Holdings, LLC has two members: (i) Wells Fargo Investment Group, Inc.; and (ii) EVEREN Capital Corporation.

    c. Wells Fargo Investment Group, Inc. is incorporated under the laws of the State of Delaware and has its principal place of business in Minneapolis, Minnesota.

    d. EVEREN Capital Corporation is incorporated under the laws of the State of Delaware and has its principal place of business in Charlotte, North Carolina.

    e. Thus, for jurisdictional purposes Wells Fargo is a citizen of Delaware, Minnesota, Missouri and North Carolina.

15.     RCM is a limited liability company organized and existing under the laws of the State of Illinois, with its principal place of business located in Chicago, Illinois. In turn:

    a. RCM has three members – Webb, Cavanaugh, and Robert Schwartz ("Schwartz").

    b. On information and belief, Webb is a resident of the State of Indiana, while Cavanaugh and Schwartz are residents of the State of Illinois.

    c. Thus, for jurisdictional purposes RCM is a citizen of Illinois and Indiana.

16.     Webb, at all times material hereto, was RCM's Chief Investment Officer, and a member of RCM.  On information and belief, Webb resides at 2318 W. Deerpath, Schererville, Indiana.  Webb was registered under FINRA Rules until November 2014.

17.     Cavanaugh, at all times material hereto, was the President and Chief Compliance Officer of RCM, and a member of RCM.  On information and belief, Cavanaugh resides at 3116 Central St., Apt. 2, Evanston, Illinois.  Cavanaugh was registered under FINRA Rules until February 2013.

18.     Grens, at all times material hereto, was RCM's Executive Director of Business Strategy.  On information and belief, Grens resides at 902 Dakin St., Apt. 1, Chicago, Illinois. Grens was registered under FINRA Rules until December 2013.

19.     Griffis was employed as a registered representative by Wells Fargo until September 13, 2013, and on information and belief, is currently employed by RCM as a Senior Vice President – Wealth Advisor.  On information and belief, Griffis resides at 1614 Imperial Drive in Glenview, Illinois.  Griffis was the Respondent in FINRA Arbitration No. 13-03429.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Wells Fargo's Complaint pursuant to 28 U.S.C. § 1332(a), in that the matter in controversy exceeds $75,000.00 exclusive of interest and costs, and is between citizens of different States.

21.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to Wells Fargo's claims occurred within this judicial district.

22.     This Court also has jurisdiction over Wells Fargo's Petition to confirm the Arbitration Award against Mr. Griffis, pursuant to 28 U.S.C. § 1331 and the relevant provisions of the Federal Arbitration Act (the "FAA" or the "Act"), 9 U.S.C. § 1, *et seq.*  More specifically:

a. The December 21, 2011 "Offer Summary" Agreement between Griffis and Wells Fargo (a true and correct copy of which is attached hereto as <u>Exhibit 1</u>) contains a mandatory arbitration covenant requiring all disputes concerning that agreement to be submitted to binding arbitration before FINRA, and further provides that "[j]udgment upon any award rendered by an arbitration panel may be entered in any state or federal court of competent jurisdiction." (Ex. 1, ¶ 11).

b. Griffis' December 21, 2011 Promissory Note in favor of Wells Fargo (a true and correct copy of which is attached hereto as <u>Exhibit 2</u>) also contains a mandatory arbitration covenant requiring all disputes concerning that Note to be submitted to binding arbitration before FINRA; that Note further provides that "[j]udgment upon any award rendered by an arbitration panel may be entered in any state or federal court of competent jurisdiction." (Ex. 2, ¶ 5).

c. Thus, the FAA, together with the Offer Summary Agreement and Promissory Note, confers jurisdiction upon this Court to confirm the Award rendered by the FINRA Arbitration Panel against Mr. Griffis.  *See,* 9 U.S.C. § 9.

23.     Venue is also proper in this District pursuant to Section 9 of the FAA, as the Arbitration Award was rendered by FINRA in Chicago, Illinois.

**FACTUAL BACKGROUND**

**A.     MR. GRIFFIS' EMPLOYMENT WITH WELLS FARGO**

24.     Mr. Griffis began his employment with Wells Fargo on or around December 21, 2011 as a financial advisor in the Company's Niles, Illinois branch office.  During the course of his employment with the Company, Mr. Griffis was also allowed to work out of Wells Fargo's Evanston, Illinois branch office.

25.     In connection with the start of his employment at Wells Fargo, and based upon his pre-hire representations regarding his trailing-12 month production, the Company provided Mr.

Griffis with a Transitional Bonus Loan in the amount of $205,318 – paid in advance, and before it was earned by him.

26.     Wells Fargo's Transitional Bonus Loan to Mr. Griffis was secured by a promissory note that he executed in favor of the Company on December 21, 2011 (the "Promissory Note") (Ex. 2).  The Promissory Note memorialized Griffis' repayment obligation of any unearned portion of the Transitional Bonus Loan that he received from Wells Fargo pursuant to an "Offer Summary" agreement also dated December 21, 2011 (the "Offer Summary").  (Ex. 1).

27.     The Promissory Note contractually required Mr. Griffis to pay Wells Fargo 88 equal monthly installments of principal and interest in the amount of $2,460.66, beginning August 1, 2012, payable on the first of each month.  The outstanding principal balance of the Promissory Note, together with any accrued and unpaid interest, was due and payable in November of 2019, or upon the occurrence of an "Event of Default" – whichever occurred first. (Ex. 2, p. 1).

28.     Pursuant to the terms of the Promissory Note, Mr. Griffis' resignation from Wells Fargo on September 13, 2013 constituted an "Event of Default."  The Promissory Note expressly provides:

> Events of Default.    The occurrence of any one or more of the following events with respect to you shall constitute an event of default under this [Promissory] Note ("Event of Default"): (a) you fail to make payment of any installment of principal and interest on this [Promissory] Note within 15 days of the date such payment becomes due and payable; (b) **your employment with Wells Fargo or any successor company ends for any reason or no reason…**

> (*Id*., p. 1, ¶ 1) (emphasis added).

29.     The Promissory Note also contained a set-off provision, which permitted the Company, upon an Event of Default, to liquidate any investments that Mr. Griffis held in any Wells Fargo account and apply those funds as a set-off toward his contractual indebtedness:

> In addition to its other rights and remedies in connection with an Event of Default, Wells Fargo may, to the maximum extent permitted under applicable law, set-off and apply the following for the payment of any unpaid principal balance and accrued interest on this [Promissory] Note…(b) any sums or assets in which you have a direct or indirect interest that are held in any brokerage, deposit or other account at Wells Fargo Advisors, ***including but not limited to Wells Fargo Bank, N.A. or any other affiliate of Wells Fargo Advisors.  You hereby authorize Wells Fargo to exercise this right of set-off.***

(<em>Id</em>., p. 3, ¶ 3) (emphasis in original).

30.     At all times during the course of his employment with Wells Fargo, Mr. Griffis owed the utmost fiduciary duties of fidelity, trust, loyalty and due care to the Company.  In addition to his fiduciary duties, Mr. Griffis was also legally prohibited from engaging in the practice of "selling away" – i.e., soliciting clients to invest outside of Wells Fargo when he was actively employed with the Company.

## B.     GRIFFIS RESIGNS FROM WELLS FARGO (TO "OFFICIALLY" JOIN RCM)

31.     On September 13, 2013, Griffis voluntarily resigned from Wells Fargo and accepted a position with RCM, (*see,* Exhibit 3), purportedly in compliance with the Protocol for Broker Recruiting (the "Protocol").

32.     The Protocol establishes certain procedures that brokers who work for signatory firms are required to follow when moving from one employer to another, specifically with respect to the handling of customer information.  The stated goal of the Protocol is to "further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ('RRs') between firms."  (Exhibit 4, p. 1).

33.     More specifically, the Protocol provides that when a registered representative (such as Mr. Griffis) moves from one employer to another – and both firms are signatories to the Protocol – the registered representative may take a "customer list" containing only the names, addresses, phone numbers, and account titles of the clients he serviced during his employment. (*Id.*).

34.     The registered representative is also required to provide a copy of the "customer list" to his local branch manager at the time of resignation. (*Id.*).  The copy provided to the branch manager (but not taken by the departing broker) must also include the account numbers for each client on the customer list.  (*Id.*).

35.     If, ***and only if***, brokers strictly follow these procedures under the Protocol when moving from one signatory firm to another, they are permitted to use that information to solicit business from their former clients without fear of being sued by their former employer.   (*Id.*).

36.     Although Mr. Griffis purported to follow the Protocol when he resigned from Wells Fargo on September 13, 2013 (*see,* Ex. 3), his departure from the Company was non-compliant with the Protocol – and Wells Fargo is entitled to pursue legal remedies against both Mr. Griffis and RCM – for at least two reasons.

37.     First, even if the Protocol applied to RCM (and it does not), Mr. Griffis failed to provide his branch manager with a copy of his customer list when he resigned from Wells Fargo.

38.     Second – and more fundamentally – RCM did not sign the Protocol or implement it in "good faith," as expressly required under the language of the Protocol itself.  Instead, it was ***Mr. Griffis*** who conceived of and coordinated RCM's registration as a Protocol firm, when he was still actively employed at Wells Fargo, as part of an orchestrated scheme with the RCM Defendants to defraud his employer and hinder and delay the Company's ability to collect the amounts due and owing under his Promissory Note.

39. Indeed, Mr. Griffis' resignation from Wells Fargo was the culmination of nearly *eight (8) months* of planning during which time: (a) the RCM Defendants induced Griffis to breach the terms of his Promissory Note and Offer Summary agreement; (b) the RCM Defendants conspired with Griffis to usurp Wells Fargo's clients and business opportunities, and to engage in the improper and legally prohibited practice of "selling away;" and (c) Griffis actively assisted RCM with its business development and operations, despite still being employed by Wells Fargo.

### C. THE RCM DEFENDANTS INDUCE GRIFFIS TO VIOLATE THE TERMS OF HIS CONTRACTUAL AGREEMENTS WITH WELLS FARGO

40. In or around early 2013 – eight months before he resigned from Wells Fargo – Mr. Griffis began discussing his future employment with RCM. On information and belief, Griffis first met with Webb, Cavanaugh, and Grens on or around January 14, 2013. (Exhibit 5). In an e-mail exchange on January 17, 2013 referencing that meeting, both Griffis and Webb expressed interest in having further discussions regarding Griffis' employment with RCM.

41. Over the next several months, Griffis stayed in constant contact with RCM. On January 31, 2013, the RCM Defendants forwarded pre-hire paperwork to Griffis. (Exhibit 6).

42. On March 4, 2013, the RCM Defendants formally extended an offer of employment to Griffis. (Exhibit 7). Griffis knew that his resignation from Wells Fargo would trigger the repayment obligations under his Promissory Note, however, and he lacked sufficient funds to repay his debt to the Company at that time.

43. On April 2, 2013, Griffis provided Webb with a copy of the Promissory Note, and asked Webb to "give [him] a call" after reviewing it. (Exhibit 8). Three days later, Griffis sent a copy of the Promissory Note to Grens and thanked him for "having it looke[d] at to see what can be done." (Exhibit 9).

44.     On April 8, 2013, Grens e-mailed Griffis to schedule a meeting "to discuss a strategy with [Webb] and myself" regarding Griffis' obligations under the Promissory Note and Offer Summary agreement.  (Exhibit 10).  Earlier that day, Griffis stated in an e-mail to Grens that he intended to repay his indebtedness to Wells Fargo.  (*Id*.).

45.     On May 30, 2013, Webb introduced Griffis (via e-mail) to RCM's legal counsel – Thomas B. Keegan, an attorney with the law firm of Senak Keegan Gleason Smith & Michaud, Ltd. – for the purpose of "letting you guys decide on how best to proceed" with respect to the Promissory Note and Offer Summary agreement.  (Exhibit 11).

46.     On August 29, 2013, Griffis provided RCM with yet another copy of his Promissory Note (as well as a copy of his Offer Summary agreement), which Defendant Grens circulated to key RCM personnel, including Defendant Cavanaugh.  (Group Exhibit 12).

47.     Ultimately, the RCM Defendants were able to convince Griffis that the best way to proceed with respect to his contractual indebtedness to Wells Fargo was simply not to pay it, despite his express intention to do so.

48.     On September 13, 2013, Griffis voluntarily resigned from Wells Fargo, triggering the repayment obligations under his Promissory Note and Offer Summary agreement. (Ex. 2, p.1, ¶1; Ex. 1, p. 3, ¶6).

49.     Less than two weeks later, on September 24, 2013, Wells Fargo sent a letter to Griffis demanding that he repay his contractual obligations to the Company in accordance with the terms of the Promissory Note.  (Exhibit 13).

50.     Contrary to his prior representations, Mr. Griffis decided not to repay his Promissory Note, ultimately forcing Wells Fargo to file its FINRA arbitration action against him.

51.     This was not before Mr. Griffis further breached his contractual agreements, however, by filing a "pre-emptive strike" lawsuit against Wells Fargo in violation of the express

mandatory arbitration covenants set forth in no less than four (4) separate contracts: (a) his Offer Summary agreement with Wells Fargo (Ex. 1, at ¶ 11); (b) his Promissory Note (Ex. 2, at ¶ 5); (c) his Form U4 Application for Securities Industry Registration (Exhibit 14, at p. 13, ¶ 5); and (d) the Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, and Assignment of Inventions (Exhibit 15, at § VIII).

### D. MR. GRIFFIS REFUSES TO REPAY HIS NOTE – AND INSTEAD FILES A "PRE-EMPTIVE STRIKE" LAWSUIT

52.     Mr. Griffis did not comply with Wells Fargo's pre-suit demand, however, and refused to repay his Note.  Instead, Mr. Griffis filed a lawsuit in the Circuit Court of Cook County, Illinois on October 22, 2012, which was subsequently removed to the U.S. District Court for the Northern District of Illinois and assigned Case No. 13 – cv – 8372.  (Exhibit 16).

53.     Mr. Griffis filed his lawsuit as a "pre-emptive strike," in the hopes of escaping liability for his Promissory Note (*Id.*).  But it was not enough for Mr. Griffis to sue Wells Fargo; for good measure, he included his former supervisor – Kevin Dailey – as a named defendant. (*Id.*).  By filing this lawsuit, Mr. Griffis violated the express terms of his Offer Summary and Promissory Note, both of which contained mandatory arbitration provisions.  When he executed those contracts, Mr. Griffis agreed that any dispute concerning his employment with Wells Fargo, or his obligations under the Note, must be resolved through binding arbitration before FINRA's Office of Dispute Resolution.

54.     The result of Mr. Griffis' "pre-emptive strike" lawsuit was predictable, and inevitable.  Judge Gottschall granted Wells Fargo's motion to compel arbitration and summarily terminated Mr. Griffis' Lawsuit on July 3, 2014.  (*Id.*).  Unfortunately, this result came only after more than six months of hard-fought litigation.  Not surprisingly, Mr. Griffis caused Wells Fargo's legal fees to escalate, and those fees were ultimately charged to Mr. Griffis in the FINRA arbitration proceeding.

55.     On March 17, 2015, the Arbitrator in the FINRA action entered an Award against Griffis and in favor of Wells Fargo.  (Exhibit 17).  The Award found Mr. Griffis liable for breach of his Promissory Note and Offer Summary agreement, and ordered him to pay Wells Fargo damages in the total amount of $289,582.90, plus accruing interest. (*Id.*).

###### E.     MR. GRIFFIS AND THE RCM DEFENDANTS PLANNED FOR HIM TO NEVER PAY THE ARBITRATION AWARD

56.     FINRA Rules require Mr. Griffis to satisfy his Award in full within thirty (30) days.  *See,* FINRA Code Arb. Pro. Rule 13904(j).  To date, Mr. Griffis has failed to pay any portion of the Award.

57.     Pursuant to Article VI, Section 3 of the FINRA By-Laws and FINRA Rule 9554, Mr. Griffis' securities license and registration may be suspended or cancelled if he fails to timely pay his Award.

58.     Mr. Griffis does not appear concerned about the potential suspension or cancellation of his securities registration, however, because Defendant Grens (incorrectly) advised him on April 7, 2013 – again, **when Mr. Griffis was still employed with Wells Fargo** – that he would only register his "Series 65" license with RCM:

> One thing to note is that (under RCM) you would not hang up your Series 7 (transactional) license as you'd only register the Series 65 license under the RIA (since we don't do retail FINRA business).

(Exhibit 18).

59.     Tellingly, Mr. Griffis did not have his "Series 65" license when he first started working at Wells Fargo in December of 2011.  He did not take his Series 65 exam and receive his registration until February 22, 2013.

60.     Although Wells Fargo paid for Mr. Griffis' Series 65 license and registration, this was once again an orchestrated plan between Griffis and the RCM Defendants.  The idea for Mr. Griffis to obtain his Series 65 license – which he could then register "under the RIA" according

to Defendant Grens – came from **Defendant Webb**, shortly after their first meeting in January of 2013.

61.     Included in the supplemental document production by RCM was an e-mail exchange between Defendants Griffis and Webb dated January 17, 2013.  (Ex. 5).  Mr. Griffis started the discussion by asking Webb whether he (i.e., Webb) had a preference as to whether Griffis obtained either the "Series 65" or "Series 66" license:

> Hi Tim:
>
> Thanks for your time Monday to discuss RCM and how you wish to grow. I am certainly interested in speaking further with you. I look forward to hearing from Marc [Grens] next week**.  I have a quick question for you – does it matter to you if I take either the Series 65 or 66, or do you have a preference?**
>
> Thanks, Bill Griffis

(Ex. 5)(emphasis added).

62.     Defendant Webb responded to Griffis' January 17, 2013, e-mail message later that same day with licensing and exam recommendations for Mr. Griffis.  (*Id.*).

63.     RCM continued to monitor Griffis' progress, including through an e-mail message from Defendant Grens (on which both Webb and Cavanaugh were copied), in which Grens wrote to Griffis: "Thanks for your patience with us and hopefully the Series 65 studying has been going well for you."  (Exhibit 19).

64.     On February 27, 2015, RCM congratulated Griffis on passing his Series 65 exam by sending him a packet of TD Ameritrade account applications and forms for Griffis to use when signing clients up to join RCM.  On behalf of RCM, Defendant Grens even provided Griffis with instructions for completing the Advisor Representative Code:

> Hi Bill,
>
> Great seeing you again yesterday and glad you were able to knock out the Series 65. I'm sure you're glad to be done with that.
>
> Tim [Webb] asked me to email you a bunch of TD Account apps and supplements as noted below (and attached):
>
> PLEASE add the Advisor RepCode to all documents at "6MI"

(Exhibit 20).

**F.** **GRIFFIS DIVERTS WELLS FARGO'S BUSINESS OPPORTUNITIES TO RCM,
WITH THE RCM DEFENDANTS' ACTIVE ASSISTANCE AND ENCOURAGEMENT**

65.     After receiving his offer of employment from RCM, Griffis knew his days with Wells Fargo were numbered, and he began to flagrantly breach his fiduciary duties to his employer.  The RCM Defendants were fully aware of Griffis' breaches of his fiduciary duties to the Company, and indeed, actively encouraged and assisted Griffis in his efforts.  The RCM Defendants were all-too-happy to use Griffis as a "Trojan Horse" to damage Wells Fargo from the inside out before he resigned from the Company.

66.     After meeting personally with Griffis on February 25, 2013, Defendant Grens sent Mr. Griffis new client packets expressly designed to allow Griffis to obtain clients for RCM – *despite the fact that Griffis was still employed by Wells Fargo and would remain so employed for almost seven more months*.  (Ex. 20).  This was part of a calculated effort by the RCM Defendants and Griffis to divert his clients and prospective clients from Wells Fargo to RCM, the Company's direct competitor.

67.     Shortly thereafter, the Defendants' scheme bore fruit.  On or around April 30, 2013 – *nearly five months before he resigned from the Company* – Defendant Griffis deliberately diverted a business opportunity to RCM.  More specifically, on or around that date Griffis informed Grens of a $250,000 fixed annuity business opportunity.  (Exhibit 21).

68.     Defendant Grens quickly informed Defendant Webb of Griffis' diversion of a business opportunity that rightfully belonged to Wells Fargo:

> Tim,
>
> Call up Bill Griffis ASAP.  He says he has a Fixed Income Opportunity for $250,000 for us.
>
> Follow up with him tomorrow on it as he doesn't want it to go to waste…
>
> Let me know how it goes[.]
>
> (*Id.*).

16

69.     Rather than expressing concern that Griffis was clearly violating his fiduciary duties to Wells Fargo, both Webb and Grens were *elated* that Griffis had diverted the business away from the Company and to RCM for their benefit.  Webb even praised Grens for assisting Griffis in breaching his fiduciary duties to Wells Fargo, stating "Nicely done Grenzo," while Grens vociferously encouraged Webb to "Get on it and let's close the deal!"  (Exhibit 22).

70.     On information and belief, RCM did in fact "close the deal" in question, and successfully assisted Defendant Griffis in usurping a business opportunity that rightfully belonged to Wells Fargo.

71.     This was hardly an isolated incident.  The RCM Defendants continued to provide Griffis with the means to divert clients and prospects away from Wells Fargo for the benefit of RCM.  On June 13, 2013 – *three (3) months before he resigned from Wells Fargo* – Griffis e-mailed Grens and requested RCM marketing materials regarding 401(k) product offerings "for use with a couple of certified public accountants" whose business Griffis intended to divert to RCM.  (Exhibit 23).  Defendant Grens responded by stating he would "get on [t]his" and find "something that [he could] pass along" to Griffis.  (*Id*.).

72.     Defendant Griffis reiterated his request for RCM marketing materials relating to 401(k) product offerings on August 6, 2013, informing Grens that he (Griffis) had received "good input" from his clients and was "getting much closer" to diverting even more business to RCM.  (Exhibit 24).  Grens responded by stating that RCM was "adding the compliance disclosures" to the marketing materials Grens requested, at which point "they should be ready to go." (*Id*.).

73.     The RCM Defendants continued to provide Griffis with various RCM marketing materials for him to pass along to Wells Fargo clients and prospects right up until the time he

resigned from the Company, including via e-mails from Grens on August 21, 2013 (Exhibit 25) and August 28, 2013 (Exhibit 26).

74.     Unfortunately for the RCM Defendants – not to mention Defendant Griffis – their conduct was illegal and violated securities regulations.  More specifically, a financial advisor offering securities for sale through a firm other than the one through which he is registered, without the express knowledge and permission of the registered firm, is a prohibited practice known as "selling away."  *See, e.g.*, FINRA Rule 3270.

75.     Selling away is prohibited by applicable securities regulations.  For example, the NASD Rules mandate:

> No person associated with a member shall participate in any manner in a private securities transaction except in accordance with the requirements of this Rule….     "Private securities transaction" shall mean any securities transaction outside the regular course or scope of an associated person's employment with a member….

*See* National Association of Securities Dealers ("NASD") Rule 3040(a), (e)(1).[1]

76.     FINRA Rule 3270 similarly prohibits outside business activities:

> No registered person may be an employee, independent contractor, sole proprietor, officer, director or partner of another person, or be compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his or her member firm . . . .

77.     At all times relevant hereto, when Defendant Griffis offered or sold investment products or services to clients on behalf of (or for the benefit of) RCM and/or the RCM Defendants, he was still employed at Wells Fargo and registered with FINRA through Wells Fargo.

---

[1] "FINRA is establishing a consolidated FINRA rulebook that will consist solely of FINRA Rules. Until the completion of the rulebook consolidation process, the FINRA rulebook includes NASD Rules…." *See* http://www.finra.org/Industry/Regulation/FINRARules/

78.     Wells Fargo neither knew of, nor permitted, Defendant Griffis to sell products to clients on behalf of (or for the benefit of) RCM and/or the RCM Defendants while he was still employed by and registered through Wells Fargo.

79.     Griffis therefore engaged in the prohibited practice of "selling away," with RCM Defendants' express knowledge, consent and active assistance.

### G.     GRIFFIS HELPS RCM ENACT BUSINESS PRACTICES SPECIFICALLY CALCULATED TO HARM WELLS FARGO (WHILE STILL EMPLOYED THERE) WITH THE RCM DEFENDANTS' KNOWLEDGE AND ACTIVE ENCOURAGEMENT

80.     While he was still employed by Wells Fargo, Griffis actively assisted RCM with its business operations, including attending weekly, in-person strategy meetings.   Upon information and belief, the "strategy" discussed during these meetings related to the diversion of Griffis' clients and prospects away from Wells Fargo to RCM.

81.     In or around June 2013 – *when he was still employed at Wells Fargo* – Griffis suggested to Defendant Grens that RCM should become a signatory to the Protocol. (Exhibit 27). Griffis' sole reason for doing so was to facilitate the transfer of the clients he serviced at Wells Fargo to RCM.

82.     With the express knowledge and encouragement by the RCM Defendants, Griffis took the laboring oar to investigate the process and procedures necessary for RCM to become a Protocol-member firm – again, all while he was still employed at Wells Fargo.

83.     In or around July 2013, Griffis contacted J.T. Gyorfy at the Securities Industry and Financial Markets Association (which administers the Protocol), requested the paperwork necessary for a broker-dealer to join the Protocol, and then forward those documents (along with Mr. Gyorfy's instructions) to RCM.  (Exhibit 28).

84.     RCM's sole purpose in entering the Protocol was to facilitate Griffis' transfer of his Wells Fargo clients to RCM after the resigned from the Company.  Indeed, Defendant Grens

expressly stated to Defendants Cavanaugh and Webb that the purpose behind RCM joining the Protocol was "for Bill Griffis to join RCM and start bringing his clients." (Group Exhibit 29). Grens made it clear to Webb and Cavanaugh that this was an urgent matter, stating RCM should sign the Protocol "immediate[ly]." (*Id.*).

85.     Griffis therefore actively assisted Wells Fargo's direct competitor with the implementation of business practices that would make it easier for him to transfer his clients away from the Company. What is more, Griffis did so while he was still employed by Wells Fargo, and with the RCM Defendants' active participation and encouragement, over the course of ***several months***.

86.     RCM joined the Protocol on or around August 15, 2013. (Group Exhibit 30). Defendant Griffis voluntarily terminated his employment with Wells Fargo and joined RCM less than one month later.

87.     Despite the fact that RCM was a signatory to the Protocol at the time Griffis resigned from Wells Fargo, and despite his efforts in making RCM a Protocol-member firm, Griffis ultimately ***did not follow the Protocol*** when he resigned from Wells Fargo. (*See, supra.*, ¶¶ 31-38).

## H.     GRIFFIS DEFRAUDS WELLS FARGO TO OBTAIN A LOAN (AND EMPLOYMENT)

88.     Unbeknownst to the Company at the time, Griffis procured his $205,318 Transitional Bonus Loan from Wells Fargo – and the attendant Offer Summary agreement and Promissory Note – through fraudulent means.

89.     Defendant Griffis made false and misleading representations to Wells Fargo in connection with his application for employment. More specifically, Mr. Griffis deliberately misrepresented his pre-hire financial performance at his former employer (Edward D. Jones &

Co., LP) to Wells Fargo (through its authorized representative, Kevin Dailey) in order to fraudulently induce the Company into:

    a. Offering him employment with Wells Fargo, the benefits of which were memorialized in the Offer Summary agreement; and

    b. Providing him with a substantial (*i.e.,* $205,318), up-front Transitional Bonus Loan, which was paid to Mr. Griffis by Wells Fargo in advance (*i.e.,* before he had earned it) and secured by his Promissory Note.

90. Wells Fargo might never have known of Defendant Griffis' fraudulent conduct but for the fact that he refused to repay his loan and Promissory Note when he voluntarily terminated his employment with the Company. Wells Fargo was forced to file a FINRA arbitration proceeding to collect on Mr. Griffis' Promissory Note, and only learned about his pre-hire fraudulent representations after receiving documents from Edward Jones in discovery on February 13, 2015.

91. Edward Jones' document production shows that Griffis' representations to Wells Fargo (via Kevin Dailey) concerning his pre-hire financial performance were false and misleading. More specifically, Griffis grossly inflated his pre-hire revenue production, and used those inflated numbers to convince Wells Fargo to not only hire him, but to give him an up-front loan of $205,318 – a loan that he subsequently failed to repay, which resulted in a FINRA Arbitration Award that he has also failed to pay.

92. In an effort to secure employment with the Company, Griffis completed and submitted a Wells Fargo Employment Application to Kevin Dailey on or around December 6, 2011. (Exhibit 31). In that application, Griffis expressed a desire to work for Wells Fargo in a branch office located in Niles, Illinois, Evanston, Illinois, or Glenview, Illinois. (*Id.*, p. 2). Griffis further expressed a desire to earn at least $80,000 per year in compensation. (*Id.*).

93.     As part of the employment application process, Griffis submitted a financial advisor ("FA") Performance Summary to the Company on or around August 11, 2011 in order to ostensibly verify his trailing-12 month production[2] at his then-current employer, Edward Jones. (Exhibit 32).  Defendant Griffis provided this information to Kevin Dailey, who at the time was the Wells Fargo branch manager overseeing Griffis' recruitment by the Company.

94.     According to the information Defendant Griffis provided to Wells Fargo, his trailing-12 month production at Edward Jones was $293,311.70.  (*Id.*).

95.     The Company (via Mr. Dailey) reviewed the trailing-12 month production information Griffis provided on or about December 9, 2011 (Ex. 32, p. 1), and later that day Wells Fargo's recruiting department confirmed that Griffis was eligible for hire.  (Group Exhibit 33).

96.     On December 12-13, 2011, Wells Fargo approved Griffis for an up-front transitional bonus loan (the "Transitional Bonus"), in the amount of $205,318, which was calculated based on 70% of the trailing-12 month production figures Griffis provided to the Company.  (Group Exhibit 34).

97.     On or around February 26, 2015, Wells Fargo discovered for the first time that the trailing-12 month production figures Griffis provided to the Company were materially false, and that Griffis had fraudulently induced the Company to not only hire him, but to provide him with the transitional bonus loan in excess of $205,000.  More specifically, the monthly production figures Griffis provided to Wells Fargo overstated his production by several thousand dollars *each and every month*.

---

[2] Trailing 12-month production (also known as "trailing 12" or "T-12") is used in the financial services industry to express a financial advisor's production level over the preceding 12 months.

98.     The following table sets forth the difference, on a month-by-month basis, between the trailing-12 month production figures Griffis provided to Wells Fargo, and his actual production figures at Edward Jones during the same time period:

| Month | Griffis' Representation to Wells Fargo[3] | Griffis' Actual Pre-Hire T-12 Production[4] | Discrepancy |
|---|---|---|---|
| October 2010 | $28,375.00 | $25,231.80 | - $3,143.20 |
| November 2010 | $23,226.00 | $20,840.19 | - $2,385.81 |
| December 2010 | $25,440.00 | $23,150.36 | - $2,289.64 |
| January 2011 | $29,249.00 | $25,917.02 | - $3,331.98 |
| February 2011 | $36,341.00 | $34,162.14 | - $2,178.86 |
| March 2011 | $19,167.00 | $17,231.14 | - $1,935.86 |
| April 2011 | $17,283.00 | $13,877.21 | - $3,405.79 |
| May 2011 | $20,931.00 | $18,734.93 | - $2,196.07 |
| June 2011 | $26,169.00 | $23,978.60 | - $2,190.04 |
| July 2011 | $36,849.00 | $33,246.14 | - $3,602.86 |
| August 2011 | $19,330.00 | $17,209.98 | - $2,120.02 |
| September 2011 | $10,951.70 | $8,867.80 | - $2,083.90 |
| | | Total: | - $30,864.03 |

99.     Griffis therefore fraudulently misrepresented the amount of his trailing-12 month production to Wells Fargo by inflating it in the amount of $30,864.03.

100.    But for Griffis' fraudulent representation, Wells Fargo would not have extended him an up-front Transitional Bonus Loan of $205,318. Moreover, if Wells Fargo had known that

---

[3] *See* Ex. 32; Ex. 33 at WFA0306-07.

[4] *See* Group Exhibit 35. Wells Fargo obtained this "commission run" printout from Edward Jones in response to a third-party subpoena issued in the FINRA Arbitration. Consistent with Fed. R. Civ. P. 5.2, confidential customer and account information has been redacted from this exhibit.

Griffis was misrepresenting his pre-hire trailing-12 month production, the Company never would have extended him an offer of employment.

101. Consequently, Griffis' contractual debt to Wells Fargo -- as evidenced by, *inter alia*, his Promissory Note, his Offer Summary agreement, and his receipt of the $205,318 up-front Transition Bonus Loan – as well as his ensuing liability for the $289,582.90 FINRA Arbitration Award against him, was the direct and proximate result of Defendant Griffis' own false pretenses, false representations to Wells Fargo (via Kevin Dailey), and actual fraud by Griffis.

## COUNT I
### FRAUDULENT INDUCEMENT
### (AGAINST DEFENDANT GRIFFIS)

102. Wells Fargo restates and incorporates by reference the allegations set forth in Paragraphs 1 through 101, inclusive, as and for Paragraph 102 of this Count I.

103. Wells Fargo obtained an Award against Mr. Griffis in a previous arbitration proceeding, FINRA Arbitration No. 13-03429, based on Mr. Griffis' breach of his contractual obligations to Wells Fargo. Wells Fargo's fraud claims against Mr. Griffis do not involve any of the claims or defenses asserted in that proceeding, and none of the facts or issues raised in this Count I were ever adjudicated in that FINRA Arbitration proceeding.

104. On or about December 9, 2011, Defendant Griffis made false statements of material fact to Wells Fargo via the Company's authorized agent, Kevin Dailey. Specifically, Defendant Griffis overstated his pre-hire trailing-12 month production figures at that time by at least $30,864.03.

105. Based upon information and belief, at the time Griffis made these false statements of material fact to Wells Fargo, he knew or believed those statements to be false.

106.    Griffis made these false statements of material fact with the intent to induce Wells Fargo to offer him employment and up-front compensation in the form of a Transitional Bonus loan.

107.    Wells Fargo reasonably relied upon the truth of Griffis' statements, as they appeared to be supported by Edward Jones documents that Griffis provided to Wells Fargo.

108.    In reliance upon the false statements of material fact conveyed by Griffis, Wells Fargo: (a) hired Mr. Griffis, (b) provided him with an up-front Transitional Bonus loan in the amount of $205,318, which was calculated as a percentage of the pre-hire trailing-12 months production figures supplied by Griffis, and (c) entered into a Promissory Note and Offer Summary agreement with him.

109.    When Griffis resigned from Wells Fargo, he lacked sufficient funds to repay the balance due under his Promissory Note, thereby requiring the Company to initiate collection proceedings against him via the FINRA Arbitration action.

110.    Those collection proceedings resulted in an Award in favor of Wells Fargo and against Mr. Griffis in the amount of $289,582.90, plus accruing interest.  Thus, Wells Fargo's $289,582.90+ Arbitration Award against Griffis is a direct and proximate result of the fraud he perpetrated on the Company in December of 2011.

111.    Accordingly, Griffis debt obligation to Wells Fargo – as originally evidenced by his Promissory Note and Offer Summary agreement, and now by the FINRA Arbitration Award – was procured by Defendant Griffis' false pretenses, false representations and actual fraud, and is non-dischargeable under 11 U.S.C. § 523(a)(2).

112.    As a direct and proximate result of Griffis' false pretenses, false representations and actual fraud, Wells Fargo has suffered damages, including, *inter alia*, compensation the Company paid to Griffis during his employment and damages arising from Griffis' breach of the

Promissory Note and Offer Summary and the unpaid FINRA Arbitration Award entered against him.

WHEREFORE, the Plaintiff, Wells Fargo Advisors, LLC, respectfully requests that the Court enter an Order awarding judgment in its favor and against the Defendant, William C. Griffis, providing for:

A. Monetary damages equal to $289,582.90, plus accrued and accruing interest, resulting from Defendant Griffis' false pretenses, false representations and actual fraud;

B. Punitive damages, in an amount sufficient to deter such conduct in the future;

C. Wells Fargo's attorneys' fees and costs incurred in connection with this matter;

D. The imposition of a constructive trust over any and all compensation Griffis has received or will in the future receive by virtue of any improper conduct on his part; and

E. Any such other and further relief as the Court deems just and proper.

## COUNT II
### BREACH OF FIDUCIARY DUTY
### (AGAINST DEFENDANT GRIFFIS)

113. Wells Fargo restates and incorporates by reference the allegations set forth in Paragraphs 1 through 112, inclusive, as and for Paragraph 113 of this Count II.

114. Like its fraud claim against Mr. Griffis, Wells Fargo's breach of fiduciary duty claim against Defendant Griffis is also based upon documents produced by a third party during discovery in the FINRA Arbitration proceeding.

115. Specifically, Defendant RCM produced several hundred pages of e-mail correspondence to Wells Fargo on or about February 26, 2015. Those e-mails unequivocally demonstrate that Mr. Griffis was conspiring with the RCM Defendants to unfairly compete against Wells Fargo *while he was still employed with the Company.*

116.    Defendant Griffis' breach of fiduciary duty was never a subject of the FINRA Arbitration proceeding.  Wells Fargo's breach of fiduciary duty claims against Mr. Griffis do not involve any of the claims or defenses asserted in that proceeding, and none of the facts or issues raised in this Count II were ever adjudicated in that FINRA Arbitration proceeding.

117.    By reason of his employment with Wells Fargo, Griffis owed the Company the utmost fiduciary obligations of fidelity, trust, loyalty, and due care.  At all times, Griffis was required to act in furtherance of the best interests of the Company, and to refrain from acting in furtherance of his personal interests at the expense or to the detriment of the Company.

118.    As alleged herein, Defendant Griffis breached his fiduciary duties to the Company by, *inter alia*, diverting Wells Fargo's clients and corporate opportunities to the RCM Defendants and actively assisting the RCM Defendants in their business development and operations while he was still employed by the Company.

119.    When breaching his fiduciary duties to the Company, Defendant Griffis acted willfully and/or with reckless disregard for Wells Fargo's rights and interests.

120.    As a direct and proximate result of Defendant Griffis' misconduct, the Company has suffered and will continue to suffer damages.  These damages include, *inter alia*, lost revenue resulting from Griffis' diversion of the Company's clients and corporate opportunities to Defendant RCM, and loss of goodwill.

WHEREFORE, the Plaintiff, Wells Fargo Advisors, LLC, respectfully requests that the Court enter an Order awarding judgment in its favor and against the Defendant, William C. Griffis, providing for:

A.    Monetary damages in excess of $500,000, resulting from Defendant Griffis' breaches of his fiduciary duties, in an amount to be determined at trial;

B.    Punitive damages, in an amount sufficient to deter such conduct in the future;

C.  Wells Fargo's actual attorneys' fees and costs incurred in connection with this matter;

D.  The imposition of a constructive trust over any and all compensation Defendant Griffis has received or will in the future receive by virtue of any improper conduct on his part; and

E.  Any such other and further relief as the Court deems just and proper.

## COUNT III
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (AGAINST ALL RCM DEFENDANTS)

121.    Wells Fargo restates and incorporates by reference the allegations set forth in Paragraphs 1 through 120, inclusive, as and for Paragraph 121 of this Count III.

122.    By reason of his employment with Wells Fargo, Defendant Griffis owed the Company the utmost fiduciary obligations of fidelity, trust, loyalty, and due care.  At all times, Griffis was required to act in furtherance of the best interests of the Company, and to refrain from acting in furtherance of his personal interests at the expense or to the detriment of the Company.

123.    As alleged herein, Griffis breached his fiduciary duties to the Company by, *inter alia*, diverting Wells Fargo's corporate opportunities to RCM; engaging in the practice of "selling away" while he was employed by the Company; and actively assisting RCM in its business operations while he was employed by the Company.

124.    As a direct and proximate result of Griffis' misconduct, the Company has suffered and will continue to suffer damages.  These damages include, *inter alia*, lost revenue resulting from Griffis' diversion of the Company's clients, accounts and other corporate opportunities to RCM, and loss of goodwill.

125.    Each of the RCM Defendants knowingly and substantially assisted Griffis in the breaches of his fiduciary duties to Wells Fargo.  As alleged herein, the RCM Defendants were

made aware of Griffis' misconduct on multiple occasions, yet intentionally chose to take no steps to stop that misconduct; instead, the RCM Defendants knowingly assisted, aided, abetted, participated in, and directly benefitted from Griffis' breaches of his fiduciary duties.

126.    At all times when they provided such assistance, the RCM Defendants were regularly aware of their role in Griffis' breaches of his fiduciary duties to Wells Fargo.

127.    The RCM Defendants materially benefitted from Griffis' breaches of his fiduciary duties to Wells Fargo by, *inter alia*, obtaining business, clients and accounts that Griffis improperly diverted from Wells Fargo.

128.    In aiding and abetting Griffis' breaches of his fiduciary duties to the Company, the RCM Defendants acted willfully or with reckless disregard for Wells Fargo's rights.

129.    As a direct and proximate result of the RCM Defendants' misconduct, Wells Fargo has suffered damages in an amount to be proven at trial.

WHEREFORE, the Plaintiff, Wells Fargo Advisors, LLC, respectfully requests that the Court enter an Order awarding judgment in its favor and against Defendants Know Your Options, LLC, *d/b/a* RCM Wealth Advisors, Timothy M. Webb, Michael A. Cavanaugh, and Marc J. Grens (collectively, the "RCM Defendants"), jointly and severally, providing for:

    A.  Monetary damages resulting from the RCM Defendants' aiding and abetting Griffis' breaches of his fiduciary duties, in an amount in excess of $75,000;

    B.  Punitive damages, in an amount sufficient to deter such conduct in the future; and

    C.  Any such other and further relief as the Court deems just and proper.

## COUNT IV
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (AGAINST ALL RCM DEFENDANTS)

130.    Wells Fargo restates and incorporates by reference the allegations set forth in Paragraphs 1 through 129, inclusive, as and for Paragraph 130 of this Count IV.

131.    At all times relevant hereto, Wells Fargo enjoyed a prospective economic advantage in the form of, *inter alia*, the revenue generated by its employee, Mr. Griffis, and his client accounts.

132.    Wells Fargo has a reasonable expectancy that this economic advantage would continue, in that the Company provided Griffis with an up-front loan in excess of $205,000 as a means of inducing him to remain employed by Wells Fargo for the term of his Promissory Note.

133.    Each of the RCM Defendants knew of Wells Fargo's prospective economic advantage.

134.    Each of the RCM Defendants intentionally and unjustifiably interfered with Wells Fargo's prospective economic advantage with Griffis and his clients, and prevented the Company's prospective economic advantage from continuing.

135.    By interfering with Wells Fargo's prospective economic advantage, the RCM Defendants acted willfully or with reckless disregard for Wells Fargo's interests.

136.    Wells Fargo has suffered actual damages as a direct and proximate result of the RCM Defendants' conduct in the form of, *inter alia*, lost revenue from its employee (Griffis) and his client accounts.

WHEREFORE, the Plaintiff, Wells Fargo Advisors, LLC, respectfully requests that the Court enter an Order awarding judgment in its favor and against Defendants Know Your Options, LLC, *d/b/a* RCM Wealth Advisors, Timothy M. Webb, Michael A. Cavanaugh, and Marc J. Grens (collectively, the "RCM Defendants"), jointly and severally, providing for:

    A.    Monetary damages resulting from the RCM Defendants' tortious interference, in an amount in excess of $75,000;

    B.    Punitive damages, in an amount sufficient to deter such conduct in the future; and

    C.    Any such other and further relief as the Court deems just and proper.

## COUNT V
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (AGAINST ALL RCM DEFENDANTS)

137.    Wells Fargo restates and incorporates by reference the allegations set forth in Paragraphs 1 through 136, inclusive, as and for Paragraph 137 of this Count V.

138.    At all times relevant hereto, Wells Fargo enjoyed contractual relationships with Mr. Griffis – namely, in the form of the Promissory Note and Offer Summary agreement.

139.    The RCM Defendants were aware of the existence of these contractual relations. Indeed, Griffis provided the RCM Defendants with a copy of the Promissory Note five months before he joined RCM, and provided them with a copy of the Offer Summary agreement nearly three weeks before he joined RCM.

140.    The RCM Defendants intentionally and maliciously interfered with the Promissory Note and Offer Summary by, *inter alia*, encouraging and inducing Griffis to breach those agreements and refuse to repay his indebtedness to Wells Fargo.

141.    The RCM Defendants' misconduct has caused Griffis to breach the Promissory Note and Offer Summary by refusing to repay the outstanding balance due and owing under those agreements.

142.    In tortiously interfering with the Company's contractual relations, the RCM Defendants acted willfully or with reckless disregard for Wells Fargo's interests.

143.    As a direct and proximate result of the RCM Defendants' misconduct, the Company has suffered and will continue to suffer damages in an amount to be proven at trial.

WHEREFORE, the Plaintiff, Wells Fargo Advisors, LLC, respectfully requests that the Court enter an Order awarding judgment in its favor and against Defendants Know Your Options, LLC, *d/b/a* RCM Wealth Advisors, Timothy M. Webb, Michael A. Cavanaugh, and Marc J. Grens (collectively, the "RCM Defendants"), jointly and severally, providing for:

A. Monetary damages resulting from the RCM Defendants' tortious interference, in an amount not less than $289,582.90;

B. Punitive damages, in an amount sufficient to deter such conduct in the future; and

C. Any such other and further relief as the Court deems just and proper.


### COUNT VI
### CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

144.    Wells Fargo restates and incorporates by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as and for Paragraph 144 of this Count VI.

145.    The RCM Defendants entered into an agreement with Defendant Griffis to participate in one or more unlawful acts – specifically, Griffis' diversion of Wells Fargo's business opportunities to RCM while he was still employed by the Company, and the breach of his contractual and fiduciary duties.

146.    The RCM Defendants took overt acts in furtherance of this agreement, including, but not limited to, contacting Griffis to discuss the diversion of Wells Fargo's business opportunities, and RCM's actual acceptance of those business opportunities for its own benefit.

147.    Griffis also took overt acts in furtherance of this agreement, including, but not limited to, breaching his contractual and fiduciary duties to Wells Fargo as alleged herein.

148.    These overt acts were done pursuant to and in furtherance of a common scheme to wrongfully divert business opportunities from Wells Fargo through Defendant Griffis' breach of his contractual and fiduciary duties to the Company.

149.    Wells Fargo has suffered actual damages as a result of the Defendants' conduct in the form of, *inter alia*, lost revenue, and the unpaid FINRA Arbitration Award against Griffis.

WHEREFORE, the Plaintiff, Wells Fargo Advisors, LLC, respectfully requests that the Court enter an Order awarding judgment in its favor and against the Defendants, Know Your

Options, LLC, *d/b/a* RCM Wealth Advisors, Timothy M. Webb, Michael A. Cavanaugh, Marc J. Grens, and William C. Griffis (collectively, "Defendants"), jointly and severally, providing for:

    A.  Monetary damages resulting from the Defendants' civil conspiracy, in an amount in excess of $75,000;

    B.  Punitive damages, in an amount sufficient to deter such conduct in the future; and

    C.  Any such other and further relief as the Court deems just and proper.

## COUNT VII
### UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

150.    Wells Fargo restates and incorporates by reference the allegations set forth in Paragraphs 1 through 149, inclusive, as and for Paragraph 150 of this Count VII.

151.    Defendants have received benefits through their misconduct described herein. More specifically, Defendants improperly and illegally diverted business opportunities away from Wells Fargo to themselves.

152.    Defendants have retained and continue to voluntarily and unjustly retain these benefits, to the deprivation of Wells Fargo, and without justification.

153.    Defendants' retention of these benefits violates the fundamental principles of justice, equity, and good conscience.

154.    In obtaining and retaining these benefits, Defendants acted and are acting willfully and maliciously.

WHEREFORE, the Plaintiff, Wells Fargo Advisors, LLC, respectfully requests that the Court enter an Order awarding judgment in its favor and against Defendants, Know Your Options, LLC, *d/b/a* RCM Wealth Advisors, Timothy M. Webb, Michael A. Cavanaugh, Marc J. Grens and William C. Griffis (collectively, the "Defendants"), jointly and severally, providing for:

A. Monetary damages resulting from Defendants' unjust enrichment, including, but not limited to, disgorgement of all profits for which it would be unjust for Defendants to retain, in an amount in excess of $75,000;

B. The imposition of a constructive trust over any revenue and/or fees obtained from or generated by accounts and/or customers introduced to RCM by Griffis;

C. Punitive damages, in an amount sufficient to deter such conduct in the future; and

D. Any such other and further relief as the Court deems just and proper.

## COUNT VIII
### ILLINOIS UNIFORM FRAUDULENT TRANSFER ACT – 740 ILCS 160/1, *ET SEQ.*
### (AGAINST GRIFFIS AND RCM)

155.     Wells Fargo restates and incorporates by reference the allegations set forth in Paragraphs 1 through 154, inclusive, as and for Paragraph 155 of this Count VIII.

156.     At all times relevant hereto, Wells Fargo possessed a Claim against Griffis as defined by the Illinois Uniform Fraudulent Transfer Act (the "Act"), 740 ILCS 160/2(c), in that the Company had a right to payment from Griffis for the outstanding principal and interest due and owing under the Promissory Note and Offer Summary agreement.

157.     At all times relevant hereto, Wells Fargo was a Creditor as defined by the Act, 740 ILCS 160/2(d), in that the Company possessed a Claim against Griffis.

158.     At all times relevant hereto, Griffis was a Debtor as defined by the Act, 740 ILCS 160/2(f), in that he was liable to Wells Fargo for the Company's Claim.

159.     Prior to his resignation from Wells Fargo, and based upon information and belief, Griffis liquidated his investment accounts with the Company and transferred the proceeds to an account at RCM, and retained control of those proceeds after the transfer described herein.

160.     Griffis made this transfer with the actual intent of hindering and/or delaying Wells Fargo's efforts to collect the amounts due and owing under his Promissory Note.  More specifically, Griffis intended to frustrate Wells Fargo's contractual right to set-off and apply the

34

assets contained in Griffis' Company account for the partial payment of the outstanding balance and accrued interest of the Promissory Note.

161.    As a direct and proximate result of Griffis' fraudulent transfer of assets, and based upon information and belief, RCM has benefitted while Wells Fargo has suffered damages.

162.    Wells Fargo is entitled under 740 ILCS 160/9(b)(1) for a judgment against RCM, as transferee of Griffis' fraudulent transfer of assets, as well as against Griffis.

WHEREFORE, the Plaintiff, Wells Fargo Advisors, LLC, respectfully requests that the Court enter an Order awarding judgment in its favor and against Defendant Know Your Options, LLC, *d/b/a* RCM Wealth Advisors ("RCM") and Defendant William C. Griffis ("Griffis"), jointly and severally, providing for:

      A.   Monetary damages equivalent to the value of the assets fraudulently transferred by Griffis to RCM; and

      B.   Any such other and further relief as the Court deems just and proper.

## COUNT IX
### CONSTRUCTIVE TRUST
### (AGAINST ALL DEFENDANTS)

163.    Wells Fargo restates and incorporates by reference the allegations set forth in Paragraphs 1 through 162, inclusive, as and for Paragraph 163 of this Count IX.

164.    Defendants have received benefits through their misconduct described herein. More specifically, Defendants have received revenue and/or fees generated by the clients and/or prospective clients wrongfully diverted, with Griffis' assistance, from Wells Fargo to RCM.

165.    Defendants have and continue to voluntarily and unjustly retain these benefits, to the deprivation of Wells Fargo, and without justification.

166.    Defendants' retention of these benefits violates the fundamental principles of justice, equity, and good conscience.

167. In obtaining and retaining these benefits, Defendants acted and are acting willfully and maliciously.

WHEREFORE, the Plaintiff, Wells Fargo Advisors, LLC, respectfully requests that the Court enter an Order awarding judgment in its favor and against Defendants, Know Your Options, LLC, *d/b/a* RCM Wealth Advisors, Timothy M. Webb, Michael A. Cavanaugh, Marc J. Grens and William C. Griffis (collectively, "Defendants"), jointly and severally, providing for:

    A. The imposition of a constructive trust over any revenue and fees obtained from or generated by any accounts or customers introduced to RCM by Griffis; and

    B. Any such other and further relief as the Court deems just and proper.

### COUNT X
**PETITION TO CONFIRM ARBITRATION AWARD**
**(AGAINST GRIFFIS)**

168. Wells Fargo restates and incorporates by reference the allegations set forth in Paragraphs 14, 19-29, and 48-57, inclusive, as and for Paragraph 168 of this Count X.

169. By this petition, Wells Fargo seeks to confirm its $289,582.90 Arbitration Award against Griffis, rendered in the FINRA arbitration proceeding, *Wells Fargo Advisors, LLC, Petitioner v. William Griffis, Respondent,* FINRA Case No. 13-03429 (the "Arbitration") by the duly-appointed Public Arbitrator (and presiding Chairperson of the sole-arbitrator Panel), Mitchell L. Marinello, on March 17, 2015 (the "Award").

170. A true and correct copy of the FINRA Award is attached hereto and incorporated herein by reference as Exhibit 17.

171. Respondent Griffis has not sought to vacate, modify, or correct the FINRA Award; nor has Respondent Griffis paid the Award within the 30-day period mandated by Rule 13904(j) of FINRA's Code of Arbitration Procedure for Industry Disputes.

172.   Wells Fargo initiated the Arbitration against Griffis by filing its Statement of Claim on November 20, 2013, asserting claims against Griffis for, *inter alia*: (a) breach of his December 21, 2011 Promissory Note, and (b) breach of his December 21, 2011 Offer Summary agreement.   A true and correct copy of Wells Fargo's Statement of Claim, including all attendant exhibits, is attached hereto and incorporated herein by reference as Exhibit 36.

173.   FINRA served Wells Fargo's Statement of Claim upon Griffis on November 29, 2013.   A true and correct copy of FINRA's service letter to Respondent Griffis is attached hereto and incorporated herein by reference as Exhibit 37.

174.   On February 21, 2014, Respondent Griffis answered Wells Fargo's Statement of Claim and filed his Submission Agreement in the FINRA Arbitration proceeding, thereby consenting to the submission of that dispute to binding arbitration before FINRA's Office of Dispute Resolution.   A true and correct copy of Griffis' Answer and Submission Agreement are attached hereto and incorporated herein by reference as Exhibit 38 and Exhibit 39, respectively.

175.   On May 9, 2014, FINRA duly appointed Mitchell L. Marinello as the Chairperson and Public Arbitrator in the Arbitration proceeding.   A true and correct copy of FINRA's Order is attached hereto and incorporated herein by reference as Group Exhibit 40.

176.   On May 19, 2014, an initial pre-hearing conference ("IPHC") was conducted by Arbitrator Marinello in the FINRA Arbitration proceeding.   Both Petitioner Wells Fargo and Respondent Griffis attended the telephonic IPHC through their respective counsel.   A true and correct copy of the IPHC Scheduling Order entered by Arbitrator Marinello in the FINRA Arbitration proceeding is attached hereto and incorporated by reference as Group Exhibit 41.

177.   At the start of the May 19, 2014 IPHC, Arbitrator Marinello asked Petitioner Wells Fargo and Respondent Griffis to confirm the composition of the arbitration panel in the FINRA Arbitration proceeding – specifically, his appointment as the Chairperson and sole

Arbitrator.  Both Petitioner Wells Fargo and Respondent Griffis, through their respective counsel, confirmed their acceptance of the panel.  (*See*, Ex. 41).

178.    At the conclusion of the IPHC, an arbitration hearing was scheduled to begin on March 9, 2015.  (*See*, Ex. 41).

179.    On March 6, 2015, Respondent Griffis agreed to forego the arbitration hearing by having a stipulated Award entered in favor of Wells Fargo and against him in the FINRA Arbitration proceeding.  A true and correct copy of the parties' joint motion for entry of the stipulated Award is attached hereto and incorporated herein by reference as Exhibit 42.

180.    Arbitrator Marinello executed the Award on March 17, 2015, and the Award was transmitted to Respondent Griffis by FINRA on March 18, 2015.  A true and correct copy of FINRA's transmittal letter effecting service of the Award on Griffis, is attached hereto and incorporated by reference as Exhibit 43.  (*See also*, Ex. 17).

181.    The total amount of the Award entered in favor of Wells Fargo and against Griffis in the FINRA Arbitration is $289,582.90, consisting of the following components:

| | |
|---|---|
| Unpaid principal balance of Promissory Note | $180,703.93 |
| Interest due under Promissory Note, through March 9, 2015 | $11,478.96 |
| Compensatory damages for breach of Offer Summary agreement | $22,534.15 |
| Attorneys' fees incurred by Wells Fargo (per Promissory Note and Offer Summary) | $65,310.00 |
| Expenses incurred by Wells Fargo (per Promissory Note and Offer Summary) | $7,430.86 |
| Reimbursement of forum fees (per Promissory Note and Offer Summary) | $2,125.00 |
| Compensatory damages for breach of Offer Summary agreement | $22,534.15 |
| **Total Award:** | **$289,582.90** |

182.    In addition, the FINRA Award includes ongoing interest in the amount of 4.27% per annum, starting on March 10, 2015, until the Award is satisfied in full.  (Ex. 17, p. 3, ¶ 2).

183.   The FINRA Award was rendered by Arbitrator Marinello on March 17, 2015, in Chicago, Illinois.

184.   Pursuant to FINRA Rule 13904(j), Griffis was required to pay the Award in full within thirty (30) days of his receipt of the Award, which was served upon him on March 18, 2015.

185.   To date, Griffis has not paid or otherwise satisfied the FINRA Award; nor has Griffis sought to vacate, modify or correct the Award in any respect.

186.   Accordingly, pursuant to Section 9 of the FAA, Wells Fargo respectfully requests that this Court confirm the March 17, 2015 Award in favor of Wells Fargo and against Griffis in the amount of $289,582.90, plus interest at the rate of 4.27%, accruing from the date of March 10, 2015 until paid.

187.   Upon service of this Petition upon Griffis, Wells Fargo will file a Motion to Confirm Arbitration Award, in accordance with Sections 9 and 13 of the FAA.

WHEREFORE, for the reasons set forth above, Petitioner Wells Fargo Advisors, LLC, respectfully requests that this Court enter and Order against Respondent William Griffis:

A.   Confirming the March 17, 2015 Arbitration Award against Respondent William Griffis and in favor of Petitioner Wells Fargo Advisors, LLC, in the FINRA Arbitration proceeding *Wells Fargo Advisors, LLC v. William Griffis*, FINRA Case No. 13-03429, in the amount of $289,582.90;

B.   Entering Judgment against Respondent William Griffis and in favor of Petitioner Wells Fargo Advisors, LLC, in the amount of $289,582.90;

C.   Awarding interest on the Judgment at the rate of 4.27%, retroactive to March 10, 2015, until the Judgment is paid in full;

D.   Awarding to Petitioner Wells Fargo Advisors, LLC its actual costs and attorneys' fees incurred in connection with confirming the Award; and

E.   Awarding to Petitioner Wells Fargo Advisors, LLC any such other and further relief as the Court deems just.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff Wells Fargo Advisors, LLC, respectfully requests a jury trial for all claims and causes of action asserted in Counts I through IX of this Complaint (but excluding the Petition to Confirm Arbitration Award asserted in Count X) that are so triable.

Dated: May 27, 2015                                  Respectfully submitted,

                                                     **WELLS FARGO ADVISORS, LLC,**
                                                     **Plaintiff / Petitioner**

                                                     By:   _/s/ Christopher S. Griesmeyer_____
                                                            One of its Attorneys

Christopher S. Griesmeyer (ARDC No. 6269851)
cgriesmeyer@grglegal.com
Mack H. Reed (ARDC No. 6287171)
mreed@grglegal.com
**GREIMAN, ROME & GRIESMEYER, LLC**
200 West Madison, Suite 755
Chicago, Illinois  60606
(312) 428-2741
(312) 332-2781 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2015, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF System which will send notification of such filing to those registered to receive electronic notices via email transmission at the email addresses provided before 5:00 p.m.

By: _/s/ Christopher S. Griesmeyer_
        Christopher S. Griesmeyer
        ARDC No. 6269851
        Greiman, Rome & Griesmeyer, LLC
        200 West Madison, Suite 755
        Chicago, Illinois 60606
        T: (312) 428-2750
        F: (312) 332-2781
        cgriesmeyer@grglegal.com